Steven W. SABASTA and Sioux Falls Insulation Supply, Inc., a South Dakota corporation, d/b/a Sioux City Insulation & Supply, Inc., Plaintiffs,

v.

BUCKAROOS, INC., Defendant.

No. 4:06–cv–180.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 31, 2007.

⸱ Charles Johnson Meyer, Woodard Emhardt Moriarty McNett & Henry LLP, Indianapolis, IN, James S. Zmuda, Califf & Harper, Moline, IL, for Defendant.

Debra Lynne Hulett, Nyemaster Goode West Hansell & O'Brien, PC, Des Moines, IA, Sander J. Morehead, Tim R. Shattuck, Woods Fuller Shultz & Smith PC, Sioux Falls, SD, for Plaintiffs.

### ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court is Defendant, Buckaroos, Inc.'s Motion for Summary Judgment of Invalidity and Non–Infringement

(Clerk's No. 26), filed on November 6, 2006. Plaintiffs, Steven W. Sabasta and Sioux Falls Insulation Supply, Inc. ("Plaintiffs" or "Sabasta"), filed a response to the motion on March 9, 2007 (Clerk's No. 62), and Defendant replied on March 15, 2007 (Clerk's No. 64). Plaintiffs filed a Cross Motion for Summary Judgment (Clerk's No. 48) on February 23, 2007. Defendant filed a resistance to the motion on March 9, 2007 (Clerk's No. 64) and Plaintiffs replied on March 23, 2007 (Clerk's No. 66). A hearing was held on the cross-motions for summary judgment on August 2, 2007. Clerk's No. 76. The matters are fully submitted.

## I. FACTUAL BACKGROUND

Plaintiffs filed the present action for patent infringement on April 17, 2006. Clerk's No. 1. Plaintiffs' Complaint alleges that Sabasta is the original inventor of a roll-bending die used to make saddles for pipe insulation. Compl. ¶ 2. Sabasta was granted United States Patent No. 6,751,-995 ("the '995 Patent") on June 22, 2004. According to the Complaint, Defendant has commercially exploited Sabasta's invention since March 2005 "by manufacturing and selling certain pipe insulation saddles that were made with a process that infringes upon the '995 Patent." Id. ¶ 7. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1338(a). Venue is proper in the Southern District of Iowa under 28 U.S.C. § 1400(b).

Pipe saddles are essentially bent or curved pieces of metal designed to support hanging pipes, with or without insulation. The metal saddle shape is commonly produced using a "roll-bending" process, whereby a blank piece of metal is run through a machine that forms the metal into an arcuate shape. Pipe saddles often have flared ends, and some pipe saddles have radial "ribs" in them, intended to strengthen the saddle and inhibit the hanger from sliding. Ribbed saddles, as end products, have been publically known and sold from at least as far back as 1993. Def.'s Statement of Material Facts ¶ 2.

Steven Sabasta is the founder and owner of Sioux Falls Insulation, Inc., which does business as Sioux City Insulation in Sioux City, Iowa. Pl.'s Statement of Material Facts ¶ 1. Sioux City Insulation is in the business of selling roofing materials, mechanical insulation, and tools related to these trades. Id. As part of its mechanical insulation business, Plaintiffs manufacture and sell pipe saddles. Id. ¶ 2. Plaintiffs claim that they first started making and selling pipe saddles under the trade name Centerline Saddles, in approximately May 2000. Id. ¶ 3.

Buckaroos, owned and operated by Jeff Rebholz, and co-founded by Mack Deichman, also manufactures and sells pipe saddles. Id. ¶¶ 22, 28. As early as April 1994, Buckaroos began purchasing roll-bending machines from a company called Acrotech. Def.'s Statement of Material Facts ¶ 7. Shortly thereafter, Buckaroos began making flared pipe saddles. Id. Buckaroos has always used a roll-bending process in manufacturing its pipe saddles, and makes and uses its own dies for use in the roll-bending machines. Id. ¶¶ 8–9. Indeed, on June 14, 1999, Buckaroos purchased a Cincinnati lathe to make dies for its Acrotech roll-bending machines. Id. ¶ 11.

In mid–2000, one of Plaintiffs' customers requested an enhanced product, and in response, Sabasta claims to have designed a prototype saddle with flared ends and two ribs in the center. Pl.'s Statement of Material Facts ¶ 4. Since Plaintiffs could not mass produce the prototype saddle with its current equipment, Sabasta began searching for a company that could manufacture a machine to mass produce the

product. *Id.* ¶ 5. In approximately March 2001, Sabasta was told that Acrotech made a machine that might work for the production of his prototype pipe saddles. *Id.* ¶ 6. Sabasta viewed the Acrotech Model 1618 on an internet site and claims to have conceived the idea of fabricating the top roll, or die, of the Acrotech 1618, so that the machine could mass produce his prototype pipe saddle. *Id.* Specifically, Sabasta claims to have come up with the idea of putting ridges in the center of the die so that when metal blanks were rolled between the die and the urethane roll of the roll-bending machine, ridges would be pressed into the metal blanks. *Id.* ¶ 7. Sabasta further believed that if the die was designed to have flared ridges on the ends, the ends of the metal blanks would flare downward when fed between the die and the urethane roll. *Id.* Sabasta claims to have communicated the details of his idea to Larry Aakhus ("Aakhus") at the time he came up with the idea. *Id.* ¶ 8.[1]

On May 23, 2001, Sabasta and Aakhus visited Acrotech and presented Sabasta's prototype saddle, along with the specifications for the dies that would be needed to mass produce them. *Id.* ¶ 10. Sabasta claims that, during his visit to Acrotech, he used a modified die to press a rib into a saddle rolled through the Acrotech machine. *Id.* ¶ 11. On June 4, 2001, Acrotech prepared a written quotation for an Acrotech Model 1618 machine and for the various shafts and tubes to be fabricated in accordance with the specifications Plaintiffs had provided. *Id.* ¶ 12. Acrotech presented Plaintiffs with a second quotation for additional shafts and tubes on June 21, 2001. *Id.* ¶ 13. On June 22, 2001, Sabasta sent a Confidential Disclosure Agreement to Acrotech, which Acro-

tech executed and returned to Sabasta. *Id.* ¶ 14. On June 25, 2001, Plaintiffs ordered the Acrotech Model 1618 and the shafts and tubes as quoted by Acrotech. *Id.* ¶ 15. The dies for the machine were manufactured by Acrotech in July and August 2001, and the machine and dies were shipped to Plaintiffs on September 4, 2001. *Id.* ¶¶ 16–17. Plaintiffs immediately put the equipment into service, and first sold ribbed saddles with flared ends made with the specially fabricated dies on October 9, 2001. *Id.* ¶ 17. Sabasta, then, claims to have conceived of the device to make ribbed/flared pipe saddles in March 2001, and to have reduced his activity to practice "at least as early as May 23, 2001." Pl.'s Response to Def.'s Statement of Material Facts ¶¶ 4–5.

In late 2001 or early 2002, Sabasta contacted an attorney regarding the patentability of his invention. Pl.'s Statement of Material Facts ¶ 18. A patent application was filed with the United States Patent and Trademark Office (the "PTO") on August 9, 2002, and Sabasta was granted the '995 Patent on June 22, 2004. *Id.* ¶¶ 20–21. The abstract of the '995 Patent provides that the patented item is a "roll-bending die for bending metal into an arc with reinforcing ribs and tapered ends." Sioux City Insulation first advertised its "Center–Lok Flared Saddles," made with the specially designed die used in the Acrotech machine, in the January 2002 issue of *Insulation Outlook.* *Id.* ¶ 19.

Buckaroos claims that, as early as the fourth quarter of 1999, it conceived of and began exploring the concept of using its roll-bending machines to make ribbed saddles, referred to by Buckaroos as the "Rib–Eye" saddle. Def.'s Statement of Material Facts ¶ 10. Buckaroos claims

---

1. Defendant objects to Plaintiffs' claims regarding his conception of the roll-bending die as having insufficient support for purposes of

the present summary judgment motions. The Court will address Defendant's objections *infra* in this Order.

that it began making ribbed dies for its roll-bending machines shortly after purchasing a Cincinnati lathe in June 1999, and that the ribbed die design it produced before the end of 1999 is substantially similar to the ribbed die design Buckaroos still uses today. *Id.* ¶ 12. Indeed, Buckaroos claims that in the last half of 1999, it made at least 1000 ribbed saddles with its roll-bending machines and self-designed ribbed die. *Id.* ¶ 13. These ribbed saddles were intended to be sent out as samples and, in fact, Buckaroos sent out samples of the ribbed saddles in the beginning of 2000. *Id.* ¶ 14. By July 1, 2000, Buckaroos had prepared a data sheet offering its ribbed saddles for sale, and in September 2000, ran an advertisement in *Insulation Outlook* for its "WRAPAROOS" hanger cover assembly, which included a ribbed pipe saddle. *Id.* ¶¶ 15–16. Buckaroos undertook more marketing and sales of products containing the ribbed saddle in the subsequent months, and claims to have finalized its die design for the ribbed saddles by April 9, 2001. *Id.* ¶ 21. Buckaroos claims that it used its self-designed ribbed die in making ribbed pipe saddles, and has used this method continuously since at least 2001. *Id.* ¶ 24.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if the dispute over it might affect the outcome of the suit under the governing law. *Id.* The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, or admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. In order to survive a motion for summary judgment, the nonmoving party must present sufficient evidence for a reasonable trier of fact to return a verdict in his or her favor. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548. On a motion for summary judgment, a court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *See United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990) (citing *Woodsmith Pub. Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990)). A court does not weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

In the present case, both sides have moved for summary judgment on the Plaintiffs' claims. Particularly in the presence of competing cross motions for summary judgment, a court must keep in mind

that summary judgment is not a paper trial. Accordingly, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In a motion for summary judgment this Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is any material dispute of fact that requires a trial. *See id.* (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 and 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2712 (3d ed.1998)). The parties then share the burden of identifying the evidence that will facilitate this assessment. *Waldridge*, 24 F.3d at 921.

Neither does filing cross motions for summary judgment mean the parties have waived their right to trial. *See Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir.1983) ("[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits.") (citations omitted). Rather, for the purposes of summary judgment, a party concedes there are no factual issues and accepts the other party's allegations only for the purpose of their own motion. *See Federal Practice and Procedure* § 2720; *see also Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir.2002) (reviewing the record with "all inferences in favor of the party against whom the motion under consideration is made" (citing *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir.1998))). " 'Cross motions simply require [a court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed.' " *Barnes v. Fleet Nat'l Bank*, 370 F.3d 164, 170 (1st Cir.2004) (quoting *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir.1996)). In this matter, then, each motion will be "evaluated independently to determine whether there exists a genuine dispute of material fact and whether the movant is entitled to judgment as a matter of law." *St. Luke's Methodist Hosp. v. Thompson*, 182 F.Supp.2d 765, 769 (N.D.Iowa 2001). Nevertheless, "[s]ummary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir.1998).

## III. LAW AND ANALYSIS

Plaintiffs claim that Buckaroos' process of manufacturing ribbed pipe saddles infringes on the '995 Patent. Buckaroos, however, claims that it conceived of using a roll-bending die to make ribbed saddles before Sabasta did, and that it was offering its ribbed saddles, made using the roll-bending process with a self-designed die, for sale before Sabasta reduced his process to practice and before Sabasta filed his patent application. Buckaroos claims that its prior conception, reduction to practice, and due diligence invalidates Sabasta's '995 Patent, pursuant to 35 U.S.C. § 102(g)(2). Buckaroos further claims that its prior reduction to practice and commercialization provides it a complete defense to Plaintiffs' claim of patent infringement under the First Inventor Defense, 35 U.S.C. § 273. Buckaroos, accordingly, moves for summary judgment on the basis of invalidity, or alternatively, for a finding of non-infringement due to the First Inventor Defense. Plaintiff, on the other hand, seeks partial summary judgment on Buckaroos' claims of invalidity, and argues that even if Buckaroos' claims of invalidity are accepted, that Buckaroos suppressed and concealed its

invention, thereby barring the invalidity defense under 35 U.S.C. § 102(g)(2). Plaintiffs further seek partial summary judgment on Buckaroos' asserted First Inventor Defense. The Court will address each argument in turn.

A. *Validity Under 35 U.S.C. § 102(g)(2)*

Buckaroos contends that Plaintiffs' '995 Patent is invalid due to Buckaroos' prior invention and reduction to practice of a die used with roll-bending equipment to produce a ribbed saddle. Plaintiffs counter that Buckaroos has not adequately demonstrated that the '995 patent is invalid and that, even if it has, Buckaroos' defense is barred because it concealed and suppressed its invention.

Title 35, United States Code, § 102(g)(2) provides:

A person shall be entitled to a patent unless—

(g)(2) before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it. In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

■ All patents are presumed valid. 35 U.S.C. § 282. Thus, a patentee need not submit any evidence in support of a conclusion of validity. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1570 (Fed.Cir.1986). Rather, a party asserting invalidity of a patent must overcome the statutory presumption by clear and convincing evidence establishing facts which support a conclusion of invalidity. *Intel Corp. v. U.S. Int'l Trade Comm'n,* 946 F.2d 821, 834 (Fed.Cir.1991). Clear

and convincing evidence is that which leaves the trier of fact with "an abiding conviction that the truth of a factual contention is 'highly probable.'" *Price v. Symsek,* 988 F.2d 1187, 1191 (Fed.Cir. 1993) (citing *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984)). Thus, as the party asserting that the '995 patent is invalid, the burden lies with Buckaroos to establish by the requisite standard that it was the first to invent the subject matter of the '995 patent, that is, the roll-bending die used for creating ribbed saddles.

Buckaroos can satisfy its burden in one of at least two ways. First, Buckaroos can prove invalidity under § 102(g)(2) by demonstrating that it was the "first party to reduce [the] invention to practice." *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1577 (Fed.Cir.1996). Failing this, Buckaroos can alternatively establish invalidity by demonstrating that "it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Id.*

1. *Reduction to practice.*

■ "A reduction to practice can be either a constructive reduction to practice, which occurs when a patent application is filed, or an actual reduction to practice." *Cooper v. Goldfarb,* 154 F.3d 1321, 1327 (Fed.Cir.1998) (citing *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed.Cir.1986)). To establish an actual reduction to practice, an inventor must prove that: "he constructed an embodiment or performed a process that met all the limitations of the claim, and that he determined that the invention would work for its intended purpose." *Slip Track Sys., Inc. v. Metal–Lite, Inc.,* 304 F.3d 1256, 1265 (Fed.Cir.2002). In the present case, both Sabasta and Buckaroos claim an actual reduction to practice prior to the

constructive reduction to practice date of August 9, 2002. Specifically, Plaintiffs claim that Sabasta reduced the roll-bending ribbed die at issue to practice "at least as early as May 23, 2001, and again in July 2001."[2] Pl.'s Objections and Responses to Def.'s Statement of Material Fact ¶ 5. Buckaroos claims that it reduced the roll-bending die at issue to practice "at least as early as January 2000." Def.'s Br. in Support of Mot. for Summ. J. at 4.

In support of its claim that it reduced the roll-bending ribbed die to practice prior to Plaintiff, Buckaroos points out, and Plaintiffs concede, that Defendant began purchasing roll-bending machines from Acrotech as early as April 1994, and purchased a Cincinnati lathe on June 14, 1999 to make dies for its Acrotech roll-bending machines. *See* Def.'s App. at A.9 (Substitute Declaration of Jeffrey Rebholz). Buckaroos claims that, as early as the fourth quarter of 1999, it conceived of and began exploring the idea of using its roll-bending machines to make ribbed saddles, referred to by Buckaroos as the "Rib–Eye" saddle.[3] With the Cincinnati lathe it had purchased, Buckaroos claims it began making ribbed dies, and that by the end of 1999, these efforts resulted in a ribbed die design substantially similar to the die design presently used by Buckaroos. During the last half of 1999, Buckaroos claims that it had made at least 1000 ribbed saddles, intended to be sent out as samples, using its newly designed ribbed die on its Acrotech roll-bending machine. Buckaroos

proffers photos of a ribbed saddle sample it sent to Cork Insulation following a January 19–20, 2000 meeting. *Id.* at A.14.

Buckaroos also submits additional marketing and sales materials in support of its contention that it reduced the ribbed-die to practice prior to Plaintiff. By July 2000, Buckaroos had prepared a data sheet offering its ribbed saddles, purportedly manufactured with the roll-bending ribbed die, for sale. *Id.* at A.15. An advertisement in the September 2000 issue of *Insulation Outlook* promoted Buckaroos' "Wraparoos hanger cover assembly," which included a ribbed saddle. *Id.* at A.116. A letter to sales representatives dated September 19, 2000 related that the Insulation Outlook advertisement was attached, and a price list was generated for selling the Wraparoos hanger cover assembly, effective October 1, 2000. *Id.* at A.120–21. Buckaroos also submits evidence that it discussed ribbed saddles in sales presentations in November 2000, *id.* at A.17–19, and presented samples of the ribbed saddles to its customers at that time. By December 5, 2000, Buckaroos had begun preparing "price pages" for its ribbed saddles, and sent a data sheet to Cork Insulation on January 22, 2001. *Id.* at A.20–22. Finally, Buckaroos claims that, by April 9, 2001, it had finalized the die design it still uses today to make ribbed saddles. It proffers photos of the die, stamped "4–9–01," as well as photos of a second die, stamped "4–24–01." *Id.* at A.23, A.122–27.

---

**2.** Buckaroos argues that Plaintiffs' claimed date of reduction to practice is actually September 4, 2001. Def.'s Statement of Material Facts ¶ 5. In response to Buckaroos' interrogatories, Plaintiffs stated: "Making pipe insulation saddles in the manner specified in the '995 Patent was reduced to practice by Plaintiffs *in or before* early September 2001." Def.'s App. at A.4. Plaintiffs further responded that pipe insulation saddles were first made

"in the manner specified in the '995 Patent on or about September 4, 2001." *Id.* at A.5.

**3.** The "Rib–Eye" saddle is sold by Buckaroos as both a free standing product and is incorporated into Buckaroos' "Wick–Away Insulated Saddles," as well as into its standard "Buckaroo T–4000 and T–6000 Insulated Saddles." Def.'s Statement of Material Facts ¶ 10.

Plaintiffs do not generally contest the fact that Buckaroos manufactured and sold ribbed saddles during the time frames alleged. Rather, Plaintiffs contend that Buckaroos has failed to proffer adequate evidence to prove to the Court by clear and convincing evidence that it manufactured and sold ribbed saddles that were made with a ribbed-die of Buckaroos' own design. The only testimony advanced by Buckaroos in support of its claim that it used its own ribbed die in manufacturing and marketing ribbed saddles between 1999 and 2001 comes from the Declaration and deposition testimony of Jeffrey Rebholz ("Rebholz"), the president and owner of Buckaroos, Def.'s App. at Exs. C, V, the deposition testimony of Kevin Romsey ("Romsey"), an employee of Buckaroos since April 1992,[4] Def.'s App. at Ex. W; Pl.'s App. at 289, and the deposition testimony of Carl Schmalzried ("Schmalzried"), an employee of Buckaroos since approximately May 1997, Def.'s App. at Ex. X; Pl.'s App. at 316. Specifically, Rebholz, Romsey, and Schmalzried have each testified regarding Buckaroos' development of a ribbed die, and about Buckaroos' process of making a ribbed die for use in its Acrotech machines in the time frame immediately following Buckaroos' purchase of the Cincinnati lathe. Schmalzried, the individual who is claimed to have actually made Buckaroos' ribbed-die, also offered the following testimony regarding the purported dates of 4–9–01 and 4–24–01 that are stamped on two of Buckaroos' dies:

Q. Can you tell me whether it was the first half of 2001 or the second half of 2001 when Buckaroos finalized its ribbed die design?

A. I believe it was the first half.

Q. And why do you believe that?

A. By the dates on my dies.

Q. Did you date all of your dies?

A. Most of the first ones, yes.

Q. Most of the first ribbed dies or most of—

A. The first ribbed dies.

Q. And why did you do that?

A. Because I was told to.

Q. By whom?

A. Mack [Deichman].

Q. Do you know why he wanted you to do that?

A. No.

Q. How did you date the dies?

A. With a stamp, a metal stamp.

Q. When did you stop dating those dies, those ribbed dies?

A. I don't recall.

Q. Do you recall when it would have been that you made the first ribbed die of the medium size?

A. It would have been after we finalized with the smaller sizes.

Q. And how about with the larger-sized dies, do you recall when you would have made your first ribbed die of the largest size?

A. I don't recall the dates at that time, no.

Q. It would have been after, though, you finalized the smaller version?

A. Yes.

Q. Did you ever date any of the medium-sized ribbed dies?

A. Yes.

Q. Have you looked to see if you can find any of those?

A. Yes.

Q. Have you found any?

A. No.

4. Romsey was initially hired as the Assistant Plant Manager for Buckaroos.

Q. Did you ever date any of the larger-sized dies?

A. I don't remember.

Q. Have you looked to see if you can find any?

A. Yes.

Q. Did you find any?

A. No.

Q. Did you look to see if you could find any of the smaller-sized dies that were dated?

A. Yes.

Q. And did you find any?

A. One.

Q. Is that the one that's dated 4/9/01?

A. Yes.

Q. And what does that date represent?

A. The date that it was completed.

Q. And do you have any independent recollection of putting that date on there yourself? Can you recall doing it?

A. Yes.

Q. With that particular die?

A. Yes.

Q. Do you recall when that die that has the date on it of April 9th, 2001 was first used on an Acrotech machine?

A. No.

Q. Was Mack [Deichman] still working at Buckaroos in April of 2001 when you did that die?

A. Yes.

Q. And the die that's dated April 9th, 2001, is that a die that reflects the final design that Buckaroos came up with for its ribbed saddles?

A. Yes.

Pl.'s App. at 321 (Schmalzried Dep.).

■ It has long been the rule in patent law that a "party claiming his own prior inventorship must proffer evidence corroborating his testimony." *Sandt Tech., Ltd. v. Resco Metal and Plastics*, 264 F.3d 1344, 1350 (Fed.Cir.2001). " 'This rule addresses the concern that a party claiming inventorship might be tempted to describe his actions in an unjustifiably self-serving manner in order to obtain a patent or to maintain an existing patent.' " *Id.* (quoting *Singh v. Brake*, 222 F.3d 1362, 1367 (Fed.Cir.2000)); *see also Union Carbide Chems. & Plastics Tech. Corp.*, 308 F.3d 1167, 1189 (Fed.Cir.2002) ("Uncorroborated oral testimony by interested parties 'is insufficient as a matter of law to establish invalidity of a patent.' " (quoting *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1370 (Fed.Cir.1999))); *Kridl v. McCormick*, 105 F.3d 1446, 1450 (Fed.Cir. 1997) ("The tribunal must also bear in mind the purpose of corroboration, which is to prevent fraud, by providing independent confirmation of the inventor's testimony.").

■ In evaluating whether a claimed prior inventorship is sufficiently corroborated to invalidate a patent, the Court must apply a "rule of reason" analysis. *Sandt Tech.*, 264 F.3d at 1350 (citing *Price*, 988 F.2d at 1195). The "rule of reason" analysis requires the "evaluation of *all* pertinent evidence" so that "a sound determination of the credibility of the inventor's story may be reached." *Price*, 988 F.2d at 1195. In applying the rule of reason to questions of corroboration, the Federal Circuit Court of Appeals has provided substantial guidance:

Although each case must be decided in view of its own facts, the determination is not utterly unstructured. Rather, our court has provided considerable guidance on the standards by which to judge whether or not an inventor's testimony has been sufficiently corroborated. Documentary or physical evidence that

is made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been corroborated. *See Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1368, 1373 (Fed.Cir.1998). Because documentary or physical evidence is created at the time of conception or reduction to practice, the risk of litigation-inspired fabrication or exaggeration is eliminated. Circumstantial evidence about the inventive process, alone, may also corroborate. [*Knorr v. Pearson & Buergin* ], 671 F.2d 1368, 1373 (CCPA 1982) ("[S]ufficient circumstantial evidence of an independent nature can satisfy the corroboration rule."). Additionally, oral testimony of someone other than the alleged inventor may corroborate an inventor's testimony. *Woodland Trust,* 148 F.3d at 1371. In contrast to contemporaneous documentary evidence, however, post-invention oral testimony is more suspect, as there is more of a risk that the witness may have a litigation-inspired motive to corroborate the inventor's testimony, and that the testimony may be inaccurate. *Id.* at 1373 (noting that testimony from witnesses is often "unsatisfactory" in view of "the forgetfulness of witnesses, their liability to make mistakes, [and] their proneness to recollect things as the party calling them would have them recollect them") (citing *Barbed Wire Patent Case,* 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154 (1892)). This court has articulated the following illustrative factors that may be useful in guiding the determination of whether a witness' testimony provides sufficient corroboration: 1) the relationship between the corroborating witness and the alleged prior user; 2) the time period between the event and trial; 3) the interest of the corroborating witness in the subject matter in suit; 4) contradiction or impeachment of the witness'

testimony; 5) the extent and details of the corroborating testimony; 6) the witness' familiarity with the subject matter of the patented invention and the prior use; 7) probability that a prior use could occur considering the state of the art at the time; and 8) impact of the invention on the industry, and the commercial value of its practice. *Id.* at 1371.

*Sandt Tech.,* 264 F.3d at 1350–51 (some citations omitted).

Plaintiffs contend that when the seven *Woodland Trust* factors are applied to the testimony of Rebholz, Romsey, and Schmalzried, they dictate a conclusion that the testimony is unreliable. Specifically, Plaintiffs make the following arguments: 1) since Rebholz is the sole shareholder of Buckaroos, he essentially *is* Buckaroos, i.e., he is the entity alleging prior inventorship, such that his testimony is presumed suspect and unreliable; 2) Rebholz has admitted that he has no independent knowledge of when Buckaroos first made a ribbed die or when it first used the Acrotech roll-bending machine to produce ribbed saddles, and Rebholz has further admitted that his testimony was based entirely on information told to him by Romsey and Schmalzried; 3) Romsey and Schmalzried's claims that the initial ribbed dies they made in 1999 were small-diameter dies fabricated from solid cold rolled round steel are undermined by the fact that Buckaroos did not purchase any round steel that could have been used to make the small-diameter dies between March 27, 1996 and 2002; 4) Schmalzried's testimony that he first made a ribbed die in July 1999 at the request of Mack Deichman, one of the co-founders of Buckaroos, is not credible because Deichman left Buckaroos in November 1997 and did not return to the company until March 2000; and 5) Plaintiffs' contention that Buckaroos began making ribbed dies in 2002 is

consistent with the fact that Buckaroos did not advertise its "Rib–Eye" saddles until April 2002 and with the fact that its first documented sale of ribbed saddles occurred in July 2002. Plaintiffs further contend that Romsey and Schmalzried, as longtime employees of Buckaroos, are interested individuals with a close relationship to the putative inventor (either Buckaroos or Rebholz) who, therefore, have motive to fabricate facts or remember only facts favorable to their employer. Additionally, Plaintiffs point out that eight years have passed since the time when Buckaroos claims to have made its first ribbed dies, indicating a likelihood that the witness testimony offered is based upon memories that are likely to have faded or that have changed to suit Buckaroos' legal needs.

Buckaroos counters Plaintiffs' arguments by pointing out that each of the witnesses has provided substantial detail regarding Buckaroos' activities in manufacturing a ribbed die and reducing it to practice, and Plaintiffs have not presented any evidence contradicting the witness testimony. Buckaroos points out that Plaintiffs' claim that Buckaroos did not purchase the steel necessary to make the dies at the time it claims to have made them mischaracterizes Romsey's testimony. Indeed, Romsey's testimony indicates that he had produced to Plaintiffs all of the purchase orders he could find, but that some of the books containing purchase orders were lost when Buckaroos moved in 2001. Pl.'s App. at 304 (Romsey Dep.). Additionally, the purchase orders that Romsey did produce, according to Buckaroos, support Schmalzried's testimony that he made dies from in-stock materials. *Id.* at 320 (Schmalzried Dep.).[5] With regard to Plaintiffs' claim that Deichman could not have instructed Schmalzried to make a ribbed die in July 1999, Buckaroos points out that Plaintiffs again mischaracterizes the testimony. Specifically, Buckaroos points out that both Schmalzried and Romsey indicated that Deichman was around the Buckaroos facility in 1999, and Rebholz has clarified that between 1997 and 2000, Deichman's office was across the street from Buckaroos' Ames, Iowa facility and that during this time, though not formally on the payroll, Deichman remained involved with Buckaroos' on-site operations as an interested party, landlord, friend, advisor, and consultant. Regarding Plaintiffs' remaining claims, Buckaroos urges that the documents produced from 1999–2002 corroborate the testimony of the three witnesses and sufficiently corroborate the testimony such that, under the rule of reason, the Court should find that Buckaroos has shown its prior inventorship by clear and convincing evidence.

When applying the rule of reason to determine whether sufficient corroboration exists to establish invalidity as a matter of law, the Court is mindful that "it is not necessary [for Buckaroos] to produce an actual over-the-shoulder observer." *Cooper*, 154 F.3d at 1330. Indeed, the " 'law does not impose an impossible standard of 'independence' on corroborative evidence

---

**5.** Schmalzried's deposition testimony on the issue was as follows:

Q. And where did you get the blanks for the ribbed dies that you made in 1999 and 2000?
A. Out of cold rolled stock.
Q. And where did you get that stock to make those dies in 1999 and 2000?
A. I'm not sure where they got it.

Q. But was it inventory on hand at Buckaroos?
A. Yes.
Q. And so I mean I guess all I'm asking you, did you just walk over to some area of the Buckaroos facility and pick up a blank?
A. Yes.
Pl.'s App. at 320.

by requiring that every point of a reduction to practice be corroborated by evidence having a source totally independent of the inventor; indeed, such a standard is the antithesis of the rule of reason.'" *Id.* at 1331 (quoting *Knorr*, 671 F.2d at 1374). There is no doubt that Buckaroos has presented corroborative evidence of its claim of prior reduction to practice. The fighting issue, however, is whether the nature of the corroborative evidence is sufficient, as a matter of law, to warrant summary judgment in favor of Buckaroos, or whether the evidence is so lacking, as a matter of law, to warrant summary judgment in favor of Plaintiff. Reduction to practice is a question of law, *see Price*, 988 F.2d at 1190, however, the contentions underlying the determination are questions of fact. *See Eaton v. Evans*, 204 F.3d 1094, 1097 (Fed.Cir.2000) ("[I]ssues of conception and reduction to practice are questions of law predicated on subsidiary factual findings."). Hence, a determination about "[w]hether or not corroboration exists is a question of fact," and the determination is fundamentally one about "credibility." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171 (Fed.Cir.2006).

■ Despite Plaintiffs' argument that Rebholz, Romsey, and Schmalzried are all highly interested parties, such that their testimony should be deemed uncorroborative of Buckaroos' claim of prior reduction to practice, the Court cannot conclude as a matter of law that their testimony is insufficient corroboration. Plaintiffs cite *Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*, in support of the proposition that " 'uncorroborated oral testimony by interested parties is insufficient as a matter of law to establish invalidity of a patent.'" 322 F.3d 1335, 1350 (Fed.Cir.2003) (quoting *Union Carbide*, 308 F.3d at 1189). Certainly Rebholz, Romsey, and Schmalzried could all be considered interested parties, as each has been and remains an employee of Buckaroos. Standing alone, the Court agrees that their testimony would be insufficient corroboration of Buckaroos' claim of prior reduction to practice. Buckaroos, however, has offered documentary evidence demonstrating that it was manufacturing and selling ribbed saddles prior to Plaintiffs' claimed reduction to practice in May 2001. While the documents on their face do not indicate whether the ribbed saddles manufactured and sold by Buckaroos were made with a ribbed die, they do offer some corroboration of each witness' testimony.

In *Loral Fairchild Corp. v. Matsushita Electronics*, Loral, the patentee relied on an inventor's affidavit to support its claimed reduction to practice. In support of the inventor's affidavit, Loral offered testimony from one of the inventor's coworkers, indicating that Loral had received certain material necessary for practicing the invention. 266 F.3d 1358, 1363 (Fed.Cir.2001). Additionally, Loral offered a responsive proposal to the United States Air Force that it had made stating that the claimed invention was "already showing reliable performance and high yield." *Id.* The court found that the evidence gave rise "to a reasonable inference" that the claimed reduction to practice had occurred how and when Loral claimed, such that it was sufficiently corroborative to defeat a motion for summary judgment. *Id.* at 1363–64.

As in *Loral*, the invalidating activities referred to in the testimony of Rebholz, Romsey, and Schmalzried were documented, at least indirectly, by tangible evidence. For instance, Buckaroos has offered photos of ribbed dies, purportedly date-stamped on the actual date of production. Buckaroos has also offered a CAD drawing of a ribbed die design, dated Au-

gust 10, 2001, plus various advertising materials, price lists, data sheets, and catalogues that it claims present products manufactured with a ribbed die. *Cf. Price,* 988 F.2d at 1194 (implying that disclosure to others and/or "embodiment[s] of the invention in some clearly perceptible form, such as drawings or a model, with sufficient proof of identity in point of time" would be sufficient to corroborate an inventor's testimony). While the dies could have been stamped with invalidating dates well after the date of their production, and while the advertised ribbed saddles could have been produced by a method not using a ribbed die, these determinations, along with others in the case, raise factual questions that turn primarily on the credibility of the witnesses, and in turn on the credibility to be given the documentary evidence in light of the witness testimony. *See Loral,* 266 F.3d at 1363 ("The court may not assess the credibility of testimony when granting summary judgment...."). Though circumstantial, the documentary evidence, coupled with the proffered witness testimony, could permit a reasonable inference that Buckaroos was the first to achieve reduction to practice under the rule of reason. *Knorr,* 671 F.2d at 1373 ("[S]ufficient circumstantial evidence of an independent nature can satisfy the corroboration rule."). This is sufficient to deny Plaintiffs' Motion for Summary Judgment on Buckaroos' § 102(g)(2) defense. Likewise, the presence of factual issues and witness credibility also require the denial of Buckaroos' motion for summary judgment. While the circumstantial evidence presented by Buckaroos *could* be viewed as sufficiently corroborative of its claim of prior reduction to practice, the evidence is by no means so clear or uncontested that such an inference is *required.* Accordingly, summary judgment is improper.

### 2. *Conception and diligence.*

 Buckaroos next argues that, even if it was not the first to reduce the ribbed die to practice, it is nonetheless entitled to summary judgment because it conceived the ribbed die more than a year before Sabasta did, and because it exercised reasonable diligence in reducing the concept to practice. Plaintiffs again counter that the evidence proffered by Buckaroos in support of its claimed conception and diligence is insufficient as a matter of law to sustain its claim of invalidity under § 102(g)(2). The arguments each party posits in support of its motion for summary judgment on the issue of conception and diligence are essentially identical to the arguments put forth in support of the parties' motions for summary judgment on the issue of reduction to practice. As the Court concluded on the reduction to practice issue, the evidence is sufficient to *permit* a reasonable inference that Buckaroos was the first to conceive the ribbed die and was diligent in its efforts to reduce it to practice. Likewise, however, the evidence is subject to numerous factual and credibility determinations which prohibit a finding that such an inference is *required.* Accordingly, both parties' motion for summary judgment on this issue is denied.

### 3. *Concealment or suppression.*

 Plaintiffs argue that, even if the ribbed die used by Buckaroos was reduced to practice prior to Plaintiffs' ribbed die, or even if Buckaroos conceived of the ribbed die first and was diligent in reducing it to practice, Plaintiffs are still entitled to summary judgment on Buckaroos' claim of invalidity because Buckaroos intentionally suppressed or concealed the invention under § 102(g)(2). Intentional suppression or concealment occurs when an inventor " 'designedly, and with the view of applying it indefinitely and exclusively for his

own profit, withholds his invention from the public.'" *Flex–Rest, LLC v. Steelcase, Inc.,* 455 F.3d 1351, 1358 (Fed.Cir.2006) (quoting *Paulik v. Rizkalla,* 760 F.2d 1270, 1273 (Fed.Cir.1985) (en banc)). To prevail on its charge of suppression or concealment, Plaintiffs "bear[s] a burden of producing evidence indicating that the prior inventor may have suppressed or concealed the invention...." *Apotex USA, Inc. v. Merck & Co., Inc.,* 254 F.3d 1031, 1037 (Fed.Cir.2001). The burden "is appropriately limited to one of production, not persuasion, giving due regard to the presumption of validity." *Id.* Thus, assuming that Buckaroos can prove invalidity by clear and convincing evidence under § 102(g)(2), the burden lies with Plaintiffs to "produce evidence sufficient to create a genuine issue of material fact as to whether the prior inventor has suppressed or concealed the invention." *Id.* Once Plaintiffs satisfy the burden of production, "the party alleging invalidity under § 102(g) must rebut any alleged suppression or concealment with clear and convincing evidence to the contrary." *Id.* at 1038.

There are two types of suppression or concealment evidence in the case law. "The first is implicated in a situation in which an inventor actively suppresses or conceals his invention from the public." *Id.* at 1038 (citing *Fujikawa v. Wattanasin,* 93 F.3d 1559, 1567 (Fed.Cir.1996)). "The second involves a legal inference of suppression or concealment based upon an unreasonable delay in filing a patent application." *Id.* (citing *Peeler v. Miller,* 535 F.2d 647, 655 (CCPA 1976)). Plaintiffs claim that Buckaroos has engaged in both types of concealment.

 Plaintiffs' argument as to suppression and concealment centers on the fact that Buckaroos concedes that it did not file for a patent application or otherwise publish any information regarding its use of a ribbed die in producing ribbed pipe saddles. The failure to file a patent application, to describe an invention in a published document, or to use an invention publicly within a reasonable time after first making an invention, may constitute suppression or concealment. *Dow Chem. v. Astro–Valcour, Inc.,* 267 F.3d 1334, 1339 (Fed.Cir.2001). There are no strict time limits regarding periods between an inventor's first making of an invention and its subsequent disclosure of the invention necessary to establish or infer suppression or concealment. *Id.* While unreasonable delay in bringing knowledge of the invention to the public may raise an inference of suppression or concealment, "'[m]ere delay, without more, is not sufficient to establish suppression or concealment.'" *Id.* (quoting *Young v. Dworkin,* 489 F.2d 1277, 1281 (CCPA 1974)).

Plaintiffs cannot satisfy their burden of production merely by pointing to Buckaroos' failure to file a patent application. While that failure "may be relevant to a determination whether [Buckaroos] suppressed or concealed its [invention], especially if there were evidence that such failure was based on a decision to retain the invention as a trade secret, that failure alone does not satisfy the patentee's burden of producing evidence sufficient to create a genuine issue of material fact of suppression or concealment." *Apotex,* 254 F.3d at 1039 (citing *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1437 (Fed.Cir.1988)). On the present record, Plaintiffs rely on nothing more than speculation to support any notion that Buckaroos suppressed or concealed its invention in an effort to retain it as a trade secret.

The more pressing question is whether Buckaroos' commercialization of its ribbed pipe saddles, purportedly made using a ribbed die, was sufficient to make the in-

vention "publicly known." *See Apotex,* 254 F.3d at 1039 ("[A] prior invention will therefore be deemed suppressed or concealed within the meaning of § 102(g) 'if within a reasonable time after completion, no steps are taken to make the invention publicly known.' " (quoting *Int'l Glass Co. v. United States,* 187 Ct.Cl. 376, 408 F.2d 395, 403 (1969))). In determining whether an invention has been made publicly known through the commercialization of an end product, the relevant question is whether the "public has gained knowledge of the invention which will insure its preservation in the public domain." *Palmer v. Dudzik,* 481 F.2d 1377, 1387 (CCPA 1973).

In *Apotex,* Merck, a drug manufacturer, manufactured enalapril sodium under the trade name Vasotec®. *Apotex,* 254 F.3d at 1033. Shortly after Merck's vice-president of marketing testified about the step-by-step process of manufacturing Vasotec®, an Apotex official allegedly conceived of a process to manufacture enalapril sodium and obtained a patent on that process. *Id.* at 1034. Apotex sued Merck for patent infringement, alleging that Merck's process of manufacturing Vasotec® infringed on its patented process. *Id.* The district court granted Merck's motion for summary judgment of invalidity, finding that Merck had invented the patented process and had not abandoned, suppressed, or concealed the invention within the meaning of § 102(g). *Id.* On appeal, Apotex argued that the district court had erred in finding that Merck had presented clear and convincing evidence that it did not suppress or conceal the patented process. *Id.* at 1035. Merck claimed, amongst other things, that the process used to manufacture Vasotec® could be reverse-engineered on the basis of publicly known information, thus effectively revealing the details of the process used to manufacture it. *Id.*

The Federal Circuit Court of Appeals found that Apotex had satisfied its burden of production to create a genuine issue of material fact as to whether Merck suppressed or concealed the process used to manufacture enalapril sodium tablets by showing that, for five years, Merck had not disclosed sufficient information, such as an ingredients list, to allow its process to be readily determined. *Id.* at 1039. Plaintiffs ask the Court to draw a parallel to *Apotex* in the present case. That is, Plaintiffs argue that Buckaroos' commercialization of ribbed pipe saddles did not readily reveal to the public the process it used in making those pipe saddles, such that Plaintiffs should be deemed to have carried their burden of production on the issue of suppression and concealment.

■ The *Apotex* court was careful to note that if Merck's process of manufacturing Vasotec® could be reverse-engineered by one of ordinary skill through an inspection of the tablets, Apotex would not be able to benefit from the inference of suppression or concealment because Merck could not be said to have delayed in making the benefits of its invention known to the public. *Id.* at 1039 n. 3. On the present record, Plaintiffs have not given any indication that a person skilled in the art would be unable to conclude that a roll-bending machine and die were used in manufacturing Buckaroos' ribbed pipe saddles. Regarding Plaintiffs' evidence that Buckaroos at one point in time experimented with using a coil line slitter to make ribbed saddles, there is again no indication that such a method could successfully have been employed in making the 1000+ ribbed sample saddles that Buckaroos claimed to have had in stock in December 1999. Indeed, Plaintiffs have done nothing more than make a bald assertion, unsupported by any record evidence, that Buckaroos could have used an-

other method for producing the ribbed saddles that it actively began marketing as early as January 2000. Absent evidence of non-obviousness from either party, the Court believes that a genuine issue of material fact exists as to whether Buckaroos commercialization of ribbed saddles was sufficient to put the public on notice of Buckaroos' invention of a ribbed die. Accordingly, the Court must conclude that genuine issues of material fact exist as to whether Plaintiffs have adequately met their burden of production on this issue.

### B. First Inventor Defense Under 35 U.S.C. § 273

■■■ Sabasta and Buckaroos each move for summary judgment on Buckaroos' claim that it is entitled to judgment pursuant to 35 U.S.C. § 273. Section 273(b)(1) provides:

> It shall be a defense to an action for infringement under section 271 of this title with respect to any subject matter that would otherwise infringe one or more claims for a method in the patent being asserted against a person, if such person had, acting in good faith, actually reduced the subject matter to practice at least 1 year before the effective filing date of such patent, and commercially used the subject matter before the effective filing date of such patent.

Section 273(b)(3)(A) provides that the so-called "First Inventor Defense" may not be asserted under § 273 "unless the invention for which the defense is asserted is for a method." The term "method" as defined in the statute, "means a method of doing or conducting business." 35 U.S.C. § 273(a)(3). The parties dispute whether Buckaroos may raise a defense under § 273 and advance competing arguments based upon the legislative history of Section 273. Regardless of whether the § 273 defense would be applicable in the present

patent infringement action, summary judgment in favor of Buckaroos on this claim would be improper in light of the Court's previous conclusion that there exist genuine issues of material fact regarding when Buckaroos' reduction to practice occurred.

As to Plaintiffs' motion for summary judgment on the issue, the determination of whether § 273 is applicable in the present action is not determinative of whether either party would be entitled to summary judgment, such that the present action would not go forward. Nonetheless, the parties are entitled to know whether the § 273 defense is applicable to in the present action so that they may adequately prepare for trial. Buckaroos concedes that the statute, on its face, applies only to claims of infringement founded on methods, defined as "a method of doing or conducting business." 35 U.S.C. § 273(a)(3). Plaintiffs assert that the '995 patent covers a specific product, that is, a ribbed die, and does not patent a method or process. Buckaroos counters that Plaintiffs' '995 Patent could reasonably be read to cover a process or method of producing ribbed saddles and that Plaintiffs' own Complaint accuses Buckaroos of infringing a process. See Compl. ¶ 7 ("Buckaroos has commercially exploited Sabasta's invention since at least March 2005 by manufacturing and selling certain pipe insulation saddles that *were made with a process* that infringes upon the '995 Patent.") (emphasis added). Buckaroos further argues that it is "in business, and is using a roll-bending process as part of conducting its business." Def.'s Reply at 16. Thus, Buckaroos claims that it is entitled to the protection of the First Inventor Defense under the statutory definition.

The First Inventor Defense of § 273 was enacted on November 29, 1999, a little over a year after the Federal Circuit decided *State Street Bank & Trust Co. v.*

*Signature Financial Group, Inc.,* 149 F.3d 1368 (Fed.Cir.1998). In 1998, the Federal Circuit's *State Street* decision put to rest formally and finally the notion that "methods of doing business" were not patentable. State Street Bank filed a declaratory judgment action and moved for partial summary judgment that Signature Financial Group's patented "Data Processing System for Hub and Spoke Financial Services Configuration" was invalid under 35 U.S.C. § 101. 149 F.3d at 1370–71. The patent involved a data processing system for monitoring information flow of financial data and for performing calculation for maintaining a financial services configuration, organized as a partnership, in which mutual funds (the "spokes") pool their assets in investment portfolios (the "hub"). *Id.* at 1371. The system provided the administrator of a mutual fund with improved administration of investments, plus the tax advantages of a partnership. *Id.* The district court found that the patent was invalid and granted State Street Bank's motion for summary judgment, noting that the claimed system was nothing more than an accounting system for a certain financial investment and that it possessed no physical transformation other than inputting, calculating, outputting, and storing numbers. *Id.* at 1372.

The Federal Circuit reversed the district court, explaining that "[u]npatentable mathematical algorithms are identifiable by showing that they are merely abstract ideas constituting disembodied concepts or truths that are not 'useful.'" *Id.* at 1373. A computer-implemented invention will fall under the statutory protection, however, if it constitutes a practical application of a mathematical algorithm by producing a concrete, useful, or tangible result. *Id.* Hence, the Federal Circuit found that the transformation of data representing financial information through a series of calculations into a final share price constituted a

practical application of a mathematical algorithm that was subject to patent protection. *Id.* at 1374–75. Thus, the *State Street* decision eased the test for patent eligibility by holding that an invention that involves an abstract idea can still obtain patent protection so long as that invention includes some practical application of the idea.

Following *State Street,* a wave of small businesses began seeking patent protection for techniques used in their businesses that they previously believed unpatentable. *See* H.R. Conf. Rep. No. 106–464, at 122 (Nov. 9, 1999) ("In the wake of *State Street,* thousands of methods and processes used internally are now being patented. In the past, many businesses that developed and used such methods and processes thought secrecy was the only protection available."). Congress recognized, in passing § 273, that "[i]t would be administratively and economically impossible to expect any inventor to apply for a patent on all methods and processes now deemed patentable." *Id.* Thus, "in order to protect inventors and to encourage proper disclosure, [§ 273] focuses on methods for doing and conducting business, including methods used in connection with internal commercial operations as well as those used in connection with the sale or transfer of useful end results—whether in the form of physical products, or in the form of services, or in the form of some other useful results; for example, results produced through the manipulation of data or other inputs to produce a useful result." *Id.* It appears from the legislative history, then, that the clear purpose of Congress' enactment of § 273 was to protect both the business method patent owner, as well as the numerous businesses that may have long used the patented method or process prior to the method being patented. More specifically, § 273 protects business own-

ers who can demonstrate use of the method more than a year prior to the patent application date from suits of infringement, but leaves intact the validity of the patent, to the benefit of the patent owner.

The relevant consideration of § 273 in the present case is whether the '995 Patent covers a "method," as defined by the statute. As a general matter, the patent statutes use the term "process" interchangeably with the term "method." "Process" is defined as "process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material." 35 U.S.C. § 100(b). The term "method," however, as defined in § 273 is specifically and exclusively defined therein as a "method of doing or conducting business." 35 U.S.C. § 273(a)(3). The legislative history of § 273 provides that "[t]he issue of whether an invention is a method is to be determined based on its underlying nature and not on the technicality of the form of the claims in the patent." H.R. Conf. Rep. No. 106–464, at 123. "For example, a method for doing or conducting business that has been claimed in a patent as a programmed machine, as in the *State Street* case, is a method for purposes of section 273 if the invention could have as easily been claimed as a method. Form should not rule substance." *Id.*

■■■ Viewing Plaintiffs' '995 Patent, the language clearly provides that the patent covers "[a] roll-bending die for bending metal into an arc with reinforcing ribs and tapered ends." *See* '995 Patent at 1. Admittedly, as Buckaroos points out, the claims of the patent often refer to the intended use of the roll-bending die. For example, Buckaroos emphasizes that Claim 1 notes that the die is "for being used with a roll-bending machine *for producing* rib reinforced rolled material." *Id.* at 11 (emphasis

added). Likewise, the Summary of the Invention states that the "present invention meets the needs presented ... by providing the body member with to least one ridge portion *for forming* a ridge in the material...." *Id.* at 9 (emphasis added). Having reviewed the language of the '995 Patent and the arguments of the parties, the Court believes that Buckaroos' interpretation of the '995 Patent as covering a process or method overreaches. In the "Background of the Invention" portion of the patent, it is clarified that prior art patents had previously been issued on roll-bending type machines. "The use of metal forming machines is known in the prior art. [One patent] describes a device for forming metal channels and tubes. Another type of metal forming machine [has] a pair of smooth rollers for rolling a sheet metal into an arcuate shape. [Other patents] use a smooth roller for rolling the material into an arcuate shape." *See* '995 Patent at 9. While acknowledging that prior patented machines or processes serve their intended purposes, the '995 Patent specifies that "the need remains for a device that has certain improved features to allow reinforcing ridges to be rolled into a material." *Id.* While certainly the patented ribbed die is intended and was designed for use in previously patented machines with the production of ribbed saddles in mind, the fact remains that the only new art in the patent is the die itself. Indeed, while it is unclear from the language of the patent, there is a strong likelihood that the process of using a roll-bending machine to bend metal into an arcuate shape is already a patented method. Indeed, Plaintiffs have never professed to have developed a new process for creating or manufacturing pipe saddles. By his patenting of the ribbed die, he has merely provided a

product that is capable of being used in a pre-existing process.

Even assuming, however, that Plaintiffs' patent covers a process or method, the legislative history of the First Inventor Defense indicates that Buckaroos' interpretation of what constitutes a "method of doing or conducting business" is far broader than what Congress intended. Earlier, unenacted versions of the bill covered much broader subject matter, such as any process or method defined in 35 U.S.C. § 100(b). The bill did not pass, however, until the subject matter of the defense was effectively limited to business methods. Indeed, just prior to the enactment of the present version of § 273, Representative Rohrabacher addressed the legislation's rocky road to approval:

> In the patent bill that passed the House last year, all patents were subjected to prior user rights. This Congress, we were initially able to limit this title to processes and methods only. More recently, however, we were able to even further limit this section to business methods only. This is an important limitation in scope to take note of because now Title II will not affect the vast majority of independent inventors and small businesses. A first inventor defense that is strictly limited to business methods will severely reduce its applicability. Furthermore, the defense applies only to business methods that have been reduced to practice at least one year prior to the effective filing date of the patent in question. Even further, to successfully use this defense a litigant must satisfy a clear and convincing evidentiary standard and risk being subjected to paying reasonable attorney fees to the prevailing party. Bottom line, the best defense to a charge of patent infringement will remain the successful assertion of invalidity, and not a first inventor defense.

*See* 145 Cong. Rec. H6929–02 (August 3, 1999).

While there is no case law directly addressing the scope of § 273 as it was enacted, the legislative history clearly indicates an intent for the First Inventor Defense to have a limited scope, that is, the defense is designed to protect small businesses from patent infringement suits for methods of conducting business that use a novel process employing unpatentable subject matter, but that have "useful, concrete and tangible result[s]." *State Street*, 149 F.3d at 1374. The fact that Buckaroos is in business and uses a process to manufacture ribbed pipe saddles does not, in light of the legislative history and the *State Street* case, bring it within the intended purview of § 273. Accordingly, summary judgment on the defense in favor of Plaintiffs is appropriate.

## IV. CONCLUSION

For the reasons stated herein, Buckaroos' Motion for Summary Judgment of Invalidity and Non–Infringement (Clerk's No. 26) is DENIED. Plaintiffs' Cross–Motion for Summary Judgment (Clerk's No. 48) is GRANTED IN PART and DENIED IN PART. Specifically, Plaintiffs' Cross–Motion for Summary Judgment is granted with regard to the First Inventor Defense, 35 U.S.C. § 273, but denied in all other respects.

IT IS SO ORDERED.